178 F.3d 1336
 Elizabeth A. MARTINI, Appellee/Cross-Appellant,
v.
FEDERAL NATIONAL MORTGAGE ASSOCIATION, et al.,
Appellants/Cross-Appellees.
 Nos. 98-7068, 98-7081.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 15, 1999
Decided June 18, 1999.
 
 Appeals from the United States District Court for the District of Columbia (No. 95cv01341) (No. 95cv03141).
 Paul J. Mode, Jr., argued the cause and filed the briefs for appellants/cross-appellees.
 Michael H. Gottesman argued the cause for appellee/crossappellant. With him on the briefs were David E. Schreiber and Larry S. Greenberg.
 Philip B. Sklover, Associate General Counsel, Equal Employment Opportunity Commission, Lorraine C. Davis, Assistant General Counsel, and Caren I. Friedman, Attorney, were on the brief for amicus curiae Equal Employment Opportunity Commission.
 Before: WILLIAMS, ROGERS and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge TATEL.
 TATEL, Circuit Judge:
 
 
 1
 A jury found the Federal National Mortgage Association liable under Title VII and the District of Columbia Human Rights Act for sexual harassment and retaliation against one of its employees, Elizabeth Martini, and awarded nearly $7 million in damages. The district court reduced her damages to $903,500. In this appeal, Fannie Mae claims that Martini's Title VII suit was untimely because she initiated it less than 180 days after she filed discrimination charges with the Equal Employment Opportunity Commission. In her cross-appeal, Martini challenges several legal conclusions underlying the district court's reduction of her damages. Finding that Title VII requires complainants to wait 180 days before suing in federal court so that the Commission may informally resolve as many charges as possible, we reverse the judgment in her favor and remand with instructions to dismiss her untimely suit without prejudice. Since Martini's claims on cross-appeal are fully briefed and likely to arise again in a new trial, we decide them as well, holding first that frontpay is not subject to Title VII's cap on compensatory damages, second that the district court should have reallocated the portion of Title VII damages above the statutory cap to Martini's recovery under D.C. law, and third that D.C. law permits Martini to recover punitive damages on a given claim as long as she has proven a basis for actual damages.
 
 
 2
 * Appellee Elizabeth Martini went to work for appellant Federal National Mortgage Association as a debt manager in 1988. By 1995, she was earning $71,000 a year and held valuable stock options. In early 1994, she alleged, one of her co-workers, Forrest Kobayashi, began harassing her because of her sex, humiliating her with abusive comments in the presence of colleagues and subordinates, and excluding her from meetings to which she should have been invited. Martini complained to her supervisor, Linda Knight, who also supervised Kobayashi, but Knight failed to come up with a solution. Despite Martini's complaints to Fannie Mae's Office of Diversity, Knight recommended Kobayashi for a promotion. Once promoted, Kobayashi was asked by Knight to reorganize his department. Designed by Kobayashi and approved by Knight, the reorganization eliminated only one job: Martini's. In March 1995, Knight fired Martini, telling her that Fannie Mae would give prospective employers no information about her job performance. Martini applied to five firms with positions similar to the one she held at Fannie Mae, but received no offers. She eventually abandoned her job search, enrolling in a two-year course to become a financial planner.
 
 
 3
 On April 10, 1995, Martini filed a sexual harassment and retaliation charge with the Equal Employment Opportunity Commission. Twenty-one days later, at her request, the EEOC issued a "right-to-sue" letter authorizing her to bring a private action in federal court. In doing so, the EEOC acted pursuant to 29 C.F.R. § 1601.28(a)(2) (1998), which provides that the Commission may, upon a complainant's request, authorize a private suit "at any time prior to the expiration of 180 days from the date of filing the charge with the Commission; provided, that [an appropriate Commission official] has determined that it is probable that the Commission will be unable to complete its administrative processing of the charge within 180 days from the filing of the charge." Issuance of the right-to-sue letter terminated further EEOC processing of Martini's charge. See id. § 1601.28(a)(3); Oral Arg. Tr. at 22 (quoting Martini's right-to-sue letter). On July 20, 101 days after filing the EEOC charge, Martini sued Kobayashi, Knight, and Fannie Mae in the United States District Court for the District of Columbia, alleging sexual harassment and retaliation in violation of Title VII and the D.C. Human Rights Act. Although Fannie Mae offered Martini a new position one month later, she rejected it because it would have put her in close contact with Kobayashi and Knight, and because Fannie Mae offered her no protection from further harassment.
 
 
 4
 Before trial, Fannie Mae moved to dismiss, arguing that the EEOC's early right-to-sue regulation, 29 C.F.R. § 1601.28(a)(2), violates the 180-day waiting period for private suits established by 42 U.S.C. § 2000e-5(f)(1) (1994), which says:
 
 
 5
 If a charge filed with the Commission ... is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge ... the Commission has not filed a civil action ... or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission ... shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge....
 
 
 6
 The district court denied the motion.
 
 
 7
 After an eleven-day trial, the district court gave the jury a single set of instructions for both the Title VII and the D.C. Human Rights Act claims. Finding the defendants liable for harassment and retaliation, the jury awarded Martini nearly $7 million in damages--$153,500 in backpay, $1,894,000 in frontpay and benefits, and $3,000,000 in punitive damages under Title VII, as well as $615,000 in compensatory damages and $1,286,000 in punitive damages under the D.C. Human Rights Act.
 
 
 8
 In a post-trial motion, Fannie Mae again challenged the timeliness of Martini's suit under section 2000e-5(f)(1) of Title VII. Finding pre-180 day private suits not prohibited by section 2000e-5(f)(1), the district court upheld the early rightto-sue regulation. See Martini v. Federal Nat'l Mortgage Ass'n, 977 F.Supp. 464, 471-72 (D.D.C.1997). The district court noted, however, that the D.C. Circuit "has not addressed this issue" and that "there is a split of authority" among other courts. Id. at 471.
 
 
 9
 Fannie Mae also sought a reduction in damages, arguing that the evidence was insufficient to justify the large awards, that punitive damages unsupported by compensatory damages are impermissible under D.C. law, and that Title VII's cap on compensatory damages, see 42 U.S.C. § 1981a(b)(3), applied to Martini's frontpay award. Finding these arguments persuasive, the district court reduced the Title VII damages to $453,500, see Martini, 977 F.Supp. at 469-71, 478-79, and reduced the D.C. Human Rights Act damages to $450,000, see id. at 474-79. In order to avoid a new trial, Martini agreed to a remittitur order prohibiting her from challenging the reduction in damages based on evidence insufficiency.
 
 
 10
 On appeal, Fannie Mae argues that the district court wrongly rejected its challenge to the timeliness of Martini's suit. Although Fannie Mae also claims that the jury verdict should be set aside because it improperly resulted from passion or prejudice, Fannie Mae waived that claim by failing to object to allegedly inflammatory statements by Martini's lawyer at trial. See Hooks v. Washington Sheraton Corp., 578 F.2d 313, 316-17 (D.C.Cir.1977). Martini raises three claims on cross-appeal: that Title VII's damages cap is inapplicable to frontpay, that any Title VII damages exceeding the cap should be reallocated to her D.C. Human Rights Act recovery, and that D.C. law allows punitive damages to be awarded in the absence of compensatory damages.
 
 II
 
 11
 The 1972 amendments to Title VII established "an integrated, multistep enforcement procedure" prescribing the powers and duties of the EEOC once a discrimination charge has been filed. Occidental Life Ins. Co. v. EEOC, 432 U.S. 355, 359, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977) (discussing the Equal Employment Opportunity Act of 1972, Pub.L. No. 92-261, 86 Stat. 103, 104-07 (codified at 42 U.S.C. § 2000e-5)). The statute directs the EEOC to notify the respondent of the charge within 10 days, to investigate the charge, and to determine "as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge" whether there is reasonable cause to believe that the charge is true. 42 U.S.C. § 2000e-5(b). If the EEOC finds no reasonable cause, then it must dismiss the charge. See id. If it finds reasonable cause, then it must attempt to resolve the dispute "by informal methods of conference, conciliation, and persuasion." Id. "If within thirty days after a charge is filed ... the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any [non-governmental] respondent...." Id. § 2000e-5(f)(1).
 
 
 12
 In language lying at the heart of Fannie Mae's challenge to the timeliness of Martini's suit, the statute further provides:
 
 
 13
 If a charge filed with the Commission ... is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge ... the Commission has not filed a civil action ... or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission ... shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge....
 
 
 14
 Id. According to Fannie Mae, this sentence sets forth the exclusive conditions under which a Title VII complainant may sue: Either the Commission must dismiss the charge, or 180 days must elapse without informal resolution of the charge or an EEOC lawsuit. Because section 2000e-5(f)(1) implicitly prohibits a private suit within 180 days unless the charge is dismissed, Fannie Mae argues, the EEOC's early right-to-sue regulation is unlawful.
 
 
 15
 Defending the regulation, Martini, supported by the EEOC as amicus curiae, points out that section 2000e-5(f)(1), while establishing certain conditions giving rise to a private cause of action, nowhere makes those conditions exclusive. According to Martini, the 180-day provision specifies the maximum, not minimum, time that Title VII complainants must wait before going to court. Although she acknowledges a statutory policy favoring administrative over judicial processing during the first 180 days after a charge is filed, Martini argues that the early right-to-sue regulation, by allowing complainants to sue immediately when the EEOC has determined that administrative processing likely will be futile (i.e., likely will not lead to dismissal, conciliation, or an EEOC lawsuit within 180 days), furthers the goal of providing quick, effective relief for aggrieved persons without frustrating the competing goal of encouraging informal resolution of complaints.
 
 
 16
 Two of our sister circuits, the Ninth and Eleventh, have squarely addressed this issue; both agree with Martini that the early right-to-sue regulation comports with congressional intent underlying section 2000e-5(f)(1)'s 180-day provision. See Sims v. Trus Joist Macmillan, 22 F.3d 1059, 1061 (11th Cir.1994); Brown v. Puget Sound Elec. Apprenticeship & Training Trust, 732 F.2d 726, 729 (9th Cir.1984); cf. Weise v. Syracuse Univ., 522 F.2d 397, 412 (2d Cir.1975) (prior to issuance of section 1601.28(a)(2), allowing EEOC to issue early right-to-sue notice"[i]n the circumstances of this case"). Although many district courts also agree with Martini, a comparable number agree with Fannie Mae and have dismissed complaints filed before expiration of the 180-day period. Compare Montoya v. Valencia County, 872 F.Supp. 904, 906 (D.N.M.1994) (finding early suits impermissible), New York v. Holiday Inns, Inc., 656 F.Supp. 675, 680 (W.D.N.Y.1984) (same), Mills v. Jefferson Bank East, 559 F.Supp. 34, 35 (D.Colo.1983) (same), Spencer v. Banco Real, 87 F.R.D. 739, 747 (S.D.N.Y.1980) (same), and Loney v. Carr-Lowrey Glass Co., 458 F.Supp. 1080, 1081 (D.Md.1978) (same), with Parker v. Noble Roman's, Inc., 1996 WL 453572, at * 2 (S.D.Ind. June 26, 1996) (finding early suits permissible), Defranks v. Court of Common Pleas, Civ. A. No. 95-327, 1995 WL 606800, at * 6 (W.D.Pa. Aug.17, 1995) (same), Rolark v. University of Chicago Hosps., 688 F.Supp. 401, 404 (N.D.Ill.1988) (same), Cattell v. Bob Frensley Ford, Inc., 505 F.Supp. 617, 622 (M.D.Tenn.1980) (same), Vera v. Bethelem Steel Corp., 448 F.Supp. 610, 614 (M.D.Pa.1978) (same), and Howard v. Mercantile Commerce Trust Co., No. 74-417C(1), 1974 WL 302, at * 2 (E.D.Mo. Nov.27, 1974).
 
 
 17
 Fannie Mae argues that Occidental Life Insurance Co. v. EEOC forecloses any doubt about section 2000e-5(f)(1)'s meaning. There the Supreme Court said that "a natural reading of [section 2000e-5(f)(1) ] can lead only to the conclusion that it simply provides that a complainant whose charge is not dismissed or promptly settled or litigated by the EEOC may himself bring a lawsuit, but that he must wait 180 days before doing so." 432 U.S. at 361. We agree with Martini that the quoted language is dictum. Decided prior to the EEOC's regulation authorizing early private suits, see 42 Fed.Reg. 47,828 (1977), Occidental Life examined whether section 2000e-5(f)(1)'s 180-day provision functions as a statute of limitations on the EEOC's power to bring a lawsuit where a complainant chooses not to sue after 180 days. The Supreme Court said no: "Nothing in [section 2000e-5(f)(1) ] indicates that EEOC enforcement powers cease if the complainant decides to leave the case in the hands of the EEOC rather than to pursue a private action." Id.; see also id. at 366 ("The subsection imposes no limitation upon the power of the EEOC to file suit in a federal court."). Although the Court reached its conclusion by offering what it believed to be the best reading of section 2000e-5(f)(1), its holding turned not on that interpretation, but only on the narrower, negative conclusion that nothing in section 2000e-5(f)(1)'s text or legislative history imposes a 180-day limitation on the EEOC's power to sue. Equally significant, in Occidental Life the EEOC had sought to continue enforcement proceedings both during and beyond the 180-day period, whereas here the Commission authorized the complainant to sue upon finding it unlikely that administrative processing would resolve the charge within 180 days. The issue presented in this case--whether Congress intended to impose a 180-day waiting period not only in the first situation but also in the second--was neither raised in Occidental Life nor addressed by the Supreme Court. Because the Court's "natural reading" of section 2000e-5(f)(1) was not essential to its holding, cf. Young v. Community Nutrition Institute, 476 U.S. 974, 980, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986) (finding ambiguity under Chevron even where one "reading of the statute may seem to some to be the more natural interpretation"), Occidental Life's interpretation of that provision does not dictate the result in this case. Like the Ninth and Eleventh Circuits, we therefore undertake our own analysis of the statute.
 
 
 18
 In "review[ing] an agency's construction of the statute which it administers," we must ask "[f]irst, always, ... whether Congress has directly spoken to the precise question at issue." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. The "precise question at issue" here is this: Does section 2000e-5(f)(1) specify the exclusive conditions under which Title VII complainants may bring private lawsuits in federal court? Put differently, did Congress clearly intend to prohibit private suits within 180 days after a charge is filed as long as the EEOC has not dismissed the charge? In discerning congressional intent, we owe no deference to the agency's views, see id. at 843 n. 9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."), and because we ultimately find congressional intent clear in this case, we need not consider what level of deference would govern EEOC interpretation of an ambiguous statutory provision, see EEOC v. Arabian-American Oil Co., 499 U.S. 244, 257, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991).
 
 
 19
 We begin with the statutory text relied on by Fannie Mae. Section 2000e-5(f)(1) says that an aggrieved party may sue under Title VII if the Commission dismisses the charge or if it neither sues the respondent nor reaches an acceptable conciliation agreement within 180 days after the filing of the charge. See 42 U.S.C. § 2000e-5(f)(1). Although the statute nowhere says that complainants may sue only if one of these conditions occurs, Fannie Mae--invoking the maxim expressio unius est exclusio alterius, i.e., the "[m]ention of one thing implies exclusion of another," BLACK'S LAW DICTIONARY 581 (6th ed.1990)--argues that the statute's explicit authorization of private suits after 180 days implies congressional intent to prohibit such suits any earlier.
 
 
 20
 A non-binding rule of statutory interpretation, not a binding rule of law, the expressio unius maxim "is often misused." Shook v. District of Columbia Fin. Responsibility & Management Assistance Auth., 132 F.3d 775, 782 (D.C.Cir.1998); see Cheney R.R. Co. v. ICC, 902 F.2d 66, 68-69 (D.C.Cir.1990) (refusing to apply expressio unius). "The maxim's force in particular situations," we have said, "depends entirely on context, whether or not the draftsmen's mention of one thing ... does really necessarily, or at least reasonably, imply the preclusion of alternatives." Shook, 132 F.3d at 782. That in turn depends on "whether, looking at the structure of the statute and perhaps its legislative history, one can be confident that a normal draftsman when he expressed 'the one thing' would have likely considered the alternatives that are arguably precluded." Id. Here, as in Cheney, Clinchfield Coal Co. v. Federal Mine Safety & Health Comm'n, 895 F.2d 773, 779 (D.C.Cir.1990), and Mobile Communications Corp. of Am. v. FCC, 77 F.3d 1399, 1404-05 (D.C.Cir.1996), the expressio unius maxim, unsupported by arguments based on the statute's structure or legislative history, " 'is simply too thin a reed to support the conclusion that Congress has clearly resolved [the] issue.' " Id. at 1405 (citation omitted); see Cheney, 902 F.2d at 69 (noting that expressio unius is "an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved").
 
 
 21
 In addition to relying on expressio unius, Fannie Mae pointed out at oral argument that the language of section 2000e-5(f)(1)'s 180-day provision parallels the language of section 2000e-5(f)(1)'s first sentence, which governs the timing of EEOC-initiated lawsuits: "If within thirty days after a charge is filed ... the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any [non-governmental] respondent." 42 U.S.C. § 2000e-5(f)(1). Relying on Martini's concession that the 30-day provision imposes a mandatory waiting period on suits by the EEOC, see Appellee's Reply Br. at 3 n.1, Fannie Mae argues that the 180-day provision imposes a similar mandatory waiting period on suits by private plaintiffs.
 
 
 22
 Like the 180-day provision, the 30-day provision specifies one condition, not necessarily an exclusive condition, under which the EEOC may sue. Fannie Mae's parallelism argument thus raises a question analogous to the one presented in this case: May the EEOC sue within 30 days after a charge is filed if a recalcitrant employer declares at the outset that it will not accept any EEOC-negotiated conciliation agreement? Not only have the parties not briefed this issue, but even if the 30-day provision requires the EEOC to wait 30 days before filing suit, the parallelism argument by itself still would not compel Fannie Mae's interpretation of the statute. To be sure, "there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). But that presumption "is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." Id. On numerous occasions, both the Supreme Court and this court have determined, after examining statutory structure, context, and legislative history, that identical words within a single act have different meanings. See, e.g., Dewsnup v. Timm, 502 U.S. 410, 417-20, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (relying on statutory context and legislative history to give different meanings to the words "allowed secured claim" in different subsections of the same bankruptcy provision); Atlantic Cleaners, 286 U.S. at 435 (relying on legislative history to give different meanings to the words "restraint of trade or commerce" in different sections of the Sherman Act); Weaver v. United States Information Agency, 87 F.3d 1429, 1437 (D.C.Cir.1996) (allowing the agency to give different meanings to the words "cleared" and "clearance" in different subsections of the same regulation). Without inquiring further into Title VII's structure, context, and legislative history, we cannot conclude with the certainty required under Chevron's first step that the parallel sentences within section 2000e-5(f)(1) have parallel meanings.
 
 
 23
 Like its use of the expressio unius maxim, Fannie Mae's parallelism argument thus leaves the question before us unanswered. Nothing in section 2000e-5(f)(1)'s language forecloses Martini's view that the 180-day provision is simply a maximum, not minimum, waiting period for complainants seeking access to federal court. To show that Martini's view unambiguously frustrates Congress's intent, Fannie Mae must shore up its reading of the statute's text with independent arguments based on structure, context, or legislative history.
 
 
 24
 Taking up this challenge, Fannie Mae observes that the 180-day provision governing private suits is part of an elaborate enforcement scheme detailing who may bring certain actions and when. See 42 U.S.C. § 2000e-5(f)(1) to (2). Relying on Hallstrom v. Tillamook County, 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989), and Perot v. Federal Election Comm'n, 97 F.3d 553 (D.C.Cir.1996), Fannie Mae says that courts have strictly enforced statutory waiting periods designed to foster informal resolution of complaints, notwithstanding the likely or even certain futility of administrative dispute resolution. The cases cited by Fannie Mae do not support its position. In Hallstrom, the Supreme Court enforced a 60-day notice and waiting period for plaintiffs wishing to file suit under the Resource Conservation and Recovery Act. See 493 U.S. at 29. Noting that Congress imposed the 60-day period to encourage administrative enforcement of environmental regulations, see id., the Court rejected the argument that where government agencies had "explicitly declined to act, it would be pointless to require the citizen to wait 60 days to commence suit," id. at 30. Although this appears to support Fannie Mae, the statute at issue in Hallstrom differs from Title VII in a critical respect: It expressly prohibits the filing of a lawsuit within the 60-day notice period. After quoting 42 U.S.C. § 6972(b)(1), the Court said: "The language of this provision could not be clearer.... Actions commenced prior to 60 days after notice are 'prohibited.' Because this language is expressly incorporated by reference into § 6972(a), it acts as a specific limitation on a citizen's right to bring suit." Id. at 26. Perot is equally inapplicable. In that case, our enforcement of a 120-day waiting period for private suits under the Federal Election Campaign Act, despite petitioner's claim that agency action would be futile, turned on the fact that the Act explicitly provides for "exclusive" agency jurisdiction during the 120-day period. See 97 F.3d at 558 (quoting 2 U.S.C. §§ 437d(e), 437c(b)(1) (1994)). Because Title VII contains no similar language prohibiting early private suits or making agency jurisdiction exclusive, neither Hallstrom nor Perot provides a basis for us to conclude that private suits within 180 days would impermissibly upset Title VII's enforcement scheme in cases where timely EEOCnegotiated resolution is improbable.
 
 
 25
 Fannie Mae argues that the likely futility of administrative processing does not defeat the statutory policy of encouraging informal resolution of charges because Congress intended the 180-day period to serve as a mandatory "cooling off" period during which the parties might voluntarily resolve their dispute, even in the absence of agency action. Not only does Fannie Mae cite no legislative history to support this claim, but the fact that the statute authorizes the EEOC to sue within the 180-day period if it is unable to secure an acceptable conciliation agreement demonstrates that Congress could not have intended to establish a mandatory "cooling off" period. The statute even authorizes a complainant to sue within 180 days if the EEOC dismisses the charge. Fannie Mae nowhere explains why it makes sense to read a "cooling off" period into the statute for cases where the EEOC cannot complete administrative processing within 180 days, but not for cases where the EEOC dismisses the charge or sues the respondent within 180 days.
 
 
 26
 Next, Fannie Mae points to legislative history indicating that Congress enacted the 180-day provision governing private suits with "an acute awareness of the enormous backlog of cases before the EEOC and the consequent delays of 18 to 24 months encountered by aggrieved persons awaiting administrative action on their complaints." Occidental Life, 432 U.S. at 369 (citing House and Senate hearings as well as floor debate). By choosing a 180-day window for informal resolution of charges despite knowing that many charges would not be resolved within 180 days, Fannie Mae argues, Congress clearly intended the 180-day period to be the minimum time complainants must wait before going to court, even if EEOC processing would be futile. Again, we are unconvinced.
 
 
 27
 We have no doubt that when Congress wrote section 2000e-5(f)(1) in 1972, it knew all about the long delays in EEOC processing of discrimination charges. See S.REP. NO. 92-415, at 23 (1971); H.R.REP. NO. 92-238 (1971), reprinted in 1972 U.S.C.C.A.N. 2137, 2147. Congress enacted the 180-day provision as "a means by which [an aggrieved party] may be able to escape from the administrative quagmire which occasionally surrounds a case caught in an overloaded administrative process." 1972 U.S.C.C.A.N. at 2148; see S.REP. NO. 92-415, at 23. After the House and Senate passed the 1972 amendments, the Conference Committee explained in a statement accompanying the Conference Report:
 
 
 28
 [The 180-day provision] is designed to make sure that the person aggrieved does not have to endure lengthy delays if the Commission ... does not act with due diligence and speed. Accordingly, the [180-day provision] allow[s] the person aggrieved to elect to pursue his or her own remedy under this title in the courts where there is agency inaction, dalliance or dismissal of the charge, or unsatisfactory resolution.
 
 
 29
 118 CONG. REC. 7168 (1972) (section-by-section analysis of 1972 amendments). But this account of section 2000e-5(f)(1) contains the same ambiguity as the statutory language itself: Did Congress simply intend to guarantee the right to sue after 180 days, or did it further intend to prohibit private suits within 180 days? To be sure, the right to sue after 180 days is the only means that Congress provided for escaping the administrative process. But Martini argues--plausibly, we think--that authorizing early private suits in cases where the EEOC likely will be unable to resolve the charge within 180 days furthers Congress's intent to "allow the person aggrieved to elect to pursue his or her own remedy ... in the courts where there is agency inaction, dalliance ... or unsatisfactory resolution." Id.
 
 
 30
 Thus, neither section 2000e-5(f)(1)'s language nor the legislative history cited by Fannie Mae reveals "the unambiguously expressed intent of Congress" on "the precise question at issue" in this case. Chevron, 467 U.S. at 843. If our inquiry were to end here, we likely would agree with the Ninth and Eleventh Circuits that the early right-to-sue regulation does not violate section 2000e-5(f)(1). Under Chevron's first step, however, we have a duty to conduct an "independent examination" of the statute in question, New York Shipping Ass'n v. Federal Maritime Comm'n, 854 F.2d 1338, 1355 (D.C.Cir.1988), looking not only "to the particular statutory language at issue," but also to "the language and design of the statute as a whole," K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988); see also United States Nat'l Bank v. Independent Ins. Agents of Am., Inc., 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) ("Over and over we have stressed that '[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' ") (quoting United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)). We thus turn to a provision of Title VII not relied on by Fannie Mae that we asked the parties to address at oral argument--a provision that we think eliminates any ambiguity about the question before us.
 
 
 31
 Section 2000e-5(b) prescribes the EEOC's duties once a charge is filed. See supra at 6. It says that the Commission "shall" investigate the charge and "shall" make a reasonable cause determination "as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge." 42 U.S.C. § 2000e-5(b). Thus, although the statute allows some flexibility in the timing of reasonable cause determinations, the Commission's duty to investigate is both mandatory and unqualified. Yet an early right-to-sue notice typically terminates EEOC investigation of the charge, see 29 C.F.R. § 1601.28(a)(3), precisely what happened in this case. Although the record nowhere contains Martini's right-to-sue letter, her counsel read it to us at oral argument: " 'With the issuance of this notice of right to sue, the Commission is terminating [its] process with respect to this charge.' " Oral Arg. Tr. at 22 (quoting Martini's right-tosue notice). We cannot square this early termination of the process or the regulation authorizing it, see 29 C.F.R. § 1601.28(a)(3), with section 2000e-5(b)'s express direction to the Commission that it investigate all charges.
 
 
 32
 Of course, Fannie Mae does not challenge section 1601.28(a)(3), but we think section 1601.28(a)(2) alone violates section 2000e-5(b) of the statute for the same reason. Even in the absence of a regulation formally terminating administrative processing, issuance of an early right-to-sue letter would have the same effect. We think it implausible that an agency as chronically overworked as the EEOC would either begin or continue to investigate charges for which it has authorized an alternative avenue of relief. In most such cases, the charge will simply go to the bottom of the pile. Although after 180 days this result comports with congressional intent, see S.REP. NO. 92-415, at 23, prior to 180 days it conflicts with section 2000e-5(b)'s unambiguous command.
 
 
 33
 Martini and the EEOC both argue that requiring a complainant to wait 180 days when the agency knows it will be unable to investigate the charge would be futile. We disagree. Section 1601.28(a)(2) does not limit the issuance of early right-to-sue letters to situations where the EEOC has determined that it is impossible to investigate within 180 days. Rather, the regulation allows the Commission to authorize a private suit when it "has determined that it is probable that [it] will be unable to complete its administrative processing of the charge within 180 days." 29 C.F.R. § 1601.28(a)(2) (emphasis added). If the term "probable" means "more likely than not," then the regulation allows the EEOC to authorize a private suit even when there is as much as a 49 percent chance that it will complete administrative processing within 180 days. And in this case, the Commission made that probability determination only 21 days after Martini filed her charge. We do not see how such a speculative prediction of futility can justify departure from section 2000e-5(b)'s express requirement that the Commission investigate every charge filed.
 
 
 34
 In any event, the regulation would violate section 2000e-5(b) even if the Commission could say with certainty that it cannot fully process a charge within 180 days. Congress well understood that the EEOC's limited resources preclude it from investigating every charge within 180 days, see supra at 14-15, but nevertheless "hoped that recourse to the private lawsuit will be the exception and not the rule." 118 CONG. REC. 7168. Contrary to this congressional "hope," the early right-to-sue regulation makes it less likely that "the vast majority of complaints will be handled through the offices of the EEOC." Id. Without authority to allow early suits, the EEOC would face more internal pressure, along with external pressure from complainants, to improve its investigatory capacities--for example, by streamlining its procedures for handling charges, by setting higher case clearance goals, by improving training, or by reallocating staff and other resources among regions or between national and regional offices--so that it could resolve as many charges as possible within 180 days. If such efforts proved inadequate to achieve statutory compliance, then the Commission would be forced to ask Congress to appropriate additional funds. Whether authorizing early private suits is preferable to enlarging the Commission's budget is a question for Congress, not the EEOC or this court. We conclude only that greater compliance with the mandatory duties that Congress expressly prescribed for the EEOC in section 2000e-5(b) will occur when all complainants must wait 180 days before filing suit than when the Commission may authorize them to sue earlier.
 
 
 35
 As we stated at the outset, the precise question at issue in this case is whether Congress clearly intended to prohibit private suits within 180 days after charges are filed. See supra at 9. Because the power to authorize early private suits inevitably and impermissibly allows the EEOC to relax its aggregate effort to comply with its statutory duty to investigate every charge filed, we think the answer is yes.
 
 
 36
 This straightforward reading of section 2000e-5(b) finds support in legislative history of section 2000e-5(f)(1) not cited by either party. While the House version of the 1972 bill containing what is now section 2000e-5(f)(1) authorized private actions after 180 days, see 117 CONG. REC. 32,113 (1971); 118 CONG. REC. 1510 (1972), the Senate version authorized private actions after only 150 days, see 118 CONG. REC. 4945 (1972). Noting this discrepancy, the conference committee chose the 180-day period. See H.R.REP. NO. 92-899 (1972), reprinted in 1972 U.S.C.C.A.N. 2179, 2182. Although this alone does not unequivocally show that Congress was unwilling to permit private suits within 180 days--Congress simply might have been unwilling to guarantee the right to sue within 180 days--we note that at least two major sponsors of the 1972 bill clearly understood the provision to prohibit early suits. Senator Javits said that it required complainants "necessarily [to] sit[ ] around awaiting 6 months." 118 CONG. REC. 1069 (1972) (Senate debate). Senator Dominick called it a "180-day private filing restriction." Id. In any event, by choosing 180 days instead of 150 days, Congress indicated its belief that informal resolution of charges, even as late as the 180th day, would be preferable to allowing complainants to sue earlier. Cf. 42 U.S.C. § 2000e-5(f)(1) (authorizing courts to stay private suits for up to 60 days to allow "further efforts of the Commission to obtain voluntary compliance"). Allowing private suits within 180 days eases the pressure on the EEOC to resolve charges informally, thus defeating the explicit congressional policy favoring EEOC-facilitated resolution up to the 180th day.
 
 
 37
 In sum, examining "the language and design of the statute as a whole," K Mart Corp., 486 U.S. at 291, and indulging all plausible inferences from the legislative history, we conclude that the EEOC's power to authorize private suits within 180 days undermines its express statutory duty to investigate every charge filed, as well as Congress's unambiguous policy of encouraging informal resolution of charges up to the 180th day. We thus hold that Title VII complainants must wait 180 days after filing charges with the EEOC before they may sue in federal court. We recognize that this conclusion runs counter to that reached by our sister circuits. See Sims, 22 F.3d at 1061; Brown, 732 F.2d at 729. But with all respect, those courts did not read section 2000e-5(f)(1) in light of section 2000e-5(b), nor did they consider the legislative history that we discovered.
 
 
 38
 This brings us to the question of relief. We agree with both parties that the 180-day waiting period is not jurisdictional. As the Supreme Court said in Zipes v. Trans World Airlines, Inc., "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). But apart from the futility arguments that we have found inadequate to relieve the EEOC of its statutory duty to process every charge for at least 180 days, Martini suggests no equitable considerations that might warrant an exception to the 180-day rule.
 
 
 39
 Finding Martini's suit untimely, we vacate the district court's judgment and remand with instructions to dismiss her complaint without prejudice. Because the EEOC stopped processing her charge 21 days after she filed it, Martini may file a new complaint in district court only after the Commission has attempted to resolve her charge for an additional 159 days.
 
 III
 
 40
 Although we have vacated the judgment in Martini's favor, we proceed in the interest of judicial economy to address her claims challenging the district court's reduction of her damages. See Committee of 100 on the Fed. City v. Hodel, 777 F.2d 711, 718-19 (D.C.Cir.1985). The claims are fully briefed and likely to arise again in a new trial. Contrary to Fannie Mae's contention, moreover, Martini never waived these claims when she agreed to remittitur; as we read the record, the remittitur covered only the district court's reduction of damages against Fannie Mae on her D.C. law retaliation claim based on insufficient evidence of the scope of these damages. See Martini, 977 F.Supp. at 478-79; Martini v. Federal Nat'l Mortgage Ass'n, No. 95-1341, at 2 (D.D.C. Mar. 27, 1998) ("Martini Mem. Op."); see also William Inglis & Sons Baking Co. v. Continental Baking Co., 942 F.2d 1332, 1343 (9th Cir.1991) ("[T]he waiver implicit in remittitur [is] a narrow one that involves only the right to appeal the reduction of damages effected by the remittitur.").
 
 Frontpay
 
 41
 Under Title VII, "[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed" $300,000 for an employer as large as Fannie Mae. 42 U.S.C. § 1981a(b)(3). Martini claims that the district court erred in applying Title VII's damages cap to the frontpay award. According to Fannie Mae, "future pecuniary losses" include frontpay. See McKnight v. General Motors Corp., 908 F.2d 104, 116 (7th Cir.1990) (defining frontpay as "a lump sum ... representing the discounted present value of the difference between the earnings [an employee] would have received in [her] old employment and the earnings [she] can be expected to receive in [her] present and future, and by hypothesis inferior, employment"). We agree with Martini.
 
 
 42
 In the provision immediately preceding the damages cap, the statute says: "Compensatory damages ... shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964." 42 U.S.C. § 1981a(b)(2). Section 706(g) authorizes district courts to order "reinstatement ... with or without back pay ... or any other equitable relief as the court deems appropriate." Id. § 2000e-5(g)(1). Like the majority of circuits, we have regarded frontpay as an equitable remedy available under section 706(g) both before and after the Civil Rights Act of 1991 made compensatory damages available under Title VII. See Barbour v. Merrill, 48 F.3d 1270, 1277-78 (D.C.Cir.1995); Anderson v. Group Hospitalization, Inc., 820 F.2d 465, 473 (D.C.Cir.1987); see also Williams v. Pharmacia, Inc., 137 F.3d 944, 951-52 (7th Cir.1998); Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1002 (10th Cir.1996); Lussier v. Runyon, 50 F.3d 1103, 1107 (1st Cir.1995); Hadley v. VAM P T S, 44 F.3d 372, 376 (5th Cir.1995); Hukkanen v. International Union of Operating Eng'rs, 3 F.3d 281, 286 (8th Cir.1993); Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1528 (11th Cir.1991). Section 1981a(b)(2) therefore excludes frontpay from the range of compensatory damages subject to the damages cap under section 1981a(b)(3).
 
 
 43
 The Tenth and Eighth Circuits have recently reached the same conclusion. See McCue v. Kansas Dep't of Human Resources, 165 F.3d 784, 792 (10th Cir.1999); Kramer v. Logan County Sch. Dist. No. R-1, 157 F.3d 620, 626 (8th Cir.1998). We respectfully disagree with the Sixth Circuit's contrary holding, see Hudson v. Reno, 130 F.3d 1193, 1203-04 (6th Cir.1997), on which the district court relied, see Martini Mem. Op., No. 95-1341, at 3, since its assertion that frontpay "is not authorized by the plain language of § 706(g) itself," Hudson, 130 F.3d at 1204, conflicts with our precedent.
 
 Reallocation of Damages
 
 44
 The district court gave the jury a single set of instructions applicable to Martini's claims under both Title VII and the D.C. Human Rights Act. See 12/9/96 Trial Tr. at 33. As required by law, the court never informed the jury about Title VII's damages cap. See 42 U.S.C. § 1981a(c)(2). Over the objections of both parties, the district court gave the jury a verdict form with "special interrogatory questions" for assessing damages for each type of claim (harassment or retaliation) against each defendant (Fannie Mae, Kobayashi, or Knight) under each statute (Title VII or D.C. Human Rights Act). Martini v. Federal Nat'l Mortgage Ass'n, No. 95-1341 (D.D.C. Dec. 13, 1996) (entering judgment on the verdict for plaintiff). The jury awarded Title VII damages well in excess of the statutory cap. The district court limited these damages (excluding backpay) to $300,000. See Martini, 977 F.Supp. at 471. Martini argues that the portion of Title VII damages exceeding the statutory cap should have been reallocated to her recovery under the D.C. Human Rights Act. Again, we agree.
 
 
 45
 Because the jury used exactly the same instructions in evaluating Martini's Title VII and D.C. law claims, and because the jury had no knowledge of Title VII's damages cap, it had no legal basis for distinguishing between the two statutes. Thus, for any one claim against any one defendant, distinguishing between damages that the jury awarded under Title VII and damages that it awarded under the D.C. Human Rights Act makes no sense. For example, although the jury awarded punitive damages of $2 million under Title VII and $1 million under D.C. law against Fannie Mae on Martini's retaliation claim, there is no basis for saying that the jury intended to impose a $2 million award specifically under Title VII, plus a $1 million award specifically under D.C. law. Instead, the most sensible inference is that the jury sought to impose a total of $3 million in punitive damages against Fannie Mae for retaliation. To be sure, only $300,000 of that amount may be awarded under Title VII. But we see no reason why Martini should not be entitled to the balance under the D.C. Human Rights Act, since the local law contains the same standards of liability as Title VII but imposes no cap on damages.
 
 
 46
 Were we not to treat damages under federal and local law as fungible where the standards of liability are the same, we would effectively limit the local jurisdiction's prerogative to provide greater remedies for employment discrimination than those Congress has afforded under Title VII. Such a result would violate Title VII's express terms: "Nothing in [Title VII] shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State...." 42 U.S.C. § 2000e-7; see id. § 2000e(i) (defining "State" to include the District of Columbia); see also Kimzey v. Walmart Stores, 107 F.3d 568, 576 (8th Cir.1997) (holding that Title VII damages cap does not apply to discrimination claims under state law); Luciano v. Olsten Corp., 912 F.Supp. 663, 675 (E.D.N.Y.1996) (reallocating Title VII damages above the cap to plaintiff's state law recovery on the ground that "Title VII does not relieve a defendant from liability and the award of damages under state law where a jury has found such a violation under both laws"). Other than traditional judicial authority to reduce damages due to excessiveness, the power to limit total damages in cases where plaintiffs sue under both federal and local law belongs to Congress and the D.C. Council, not this court.
 
 
 47
 Availability of punitive damages under D.C. law
 
 
 48
 Turning finally to Martini's challenge to the district court's holding that D.C. law prohibits the award of punitive damages where no compensatory damages have been awarded on a particular legal claim, we think the controlling precedent is Maxwell v. Gallagher, where the D.C. Court of Appeals said that "[a] plaintiff must prove a basis for actual damages to justify the imposition of punitive damages." 709 A.2d 100, 104 (D.C.1998). Although the jury in this case assessed punitive damages but no compensatory damages against Knight and Fannie Mae on Martini's sexual harassment claim under the D.C. Human Rights Act, it did assess compensatory damages against Fannie Mae on Martini's harassment claim under Title VII. Since the court gave the jury a single instruction for finding liability under both Title VII and D.C. law, see supra at , we are inclined to believe that Martini "prove[d] a basis for actual damages" against Fannie Mae--but not against Knight--on her harassment claim under D.C. law. Id.; see Dyer v. Bergman & Assocs., 657 A.2d 1132, 1139-40 (D.C.1995) (affirming punitive damage award in the absence of compensatory damage award where plaintiff had proven actual injury and had accepted a compensatory arbitration award). Because we have dismissed Martini's complaint, however, we leave the proper application of Maxwell to the district court should this issue arise again in a new trial.
 
 IV
 
 49
 We vacate the district court's judgment and remand with instructions to dismiss the complaint without prejudice.
 
 
 50
 So ordered.