**William E. HALL, Plaintiff,**

v.

**FLIGHTSAFETY INTERNATIONAL, INC., Defendant.**

No. Civ.A. 98–4026–CM.

United States District Court,
D. Kansas.

July 11, 2000.

William L. Fry, William Fry & Associates, Wichita, KS, for William E Hall, plaintiff.

Wyatt Wright, Boyd A. Byers, Foulston & Siefkin L.L.P., Wichita, KS, for Flight Safety International, Incorporated, defendant.

### MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiff William Hall is an employee of defendant FlightSafety International, Inc. Plaintiff in this case claims that defendant discriminated against him on the basis of his race and sex in violation of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e–3 *et seq.*, the Civil Rights Act of 1991, his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and his race in violation of 42 U.S.C. § 1981, and as amended 42 U.S.C. § 1981a. This matter is before the court on defendant's motion for summary judgment (Doc. 89) and defendant's motion to limit the time period in which plaintiff may raise allegations of discrimination (Doc. 80). As set forth in more detail below, defendant's motion for summary judgment is granted, and defendant's motion to limit time period is moot.

### I. Facts[1]

Defendant is a corporation involved in the teaching and training of pilots and maintenance technicians to operate and service various aircraft. Plaintiff has been employed by defendant (and its predecessor) since 1986 and currently works as an instructional systems support specialist to facilitate the use of computers and other instructional tools. In that position, plaintiff handles the network computers, video library, and the video stations. Plaintiff has, in the past, also maintained software and written manuals.

### A. Plaintiff's Background

Plaintiff, a black male, was born on May 25, 1939. Prior to plaintiff's employment with defendant, he was in the Air Force for twenty-six years. In the Air Force, plaintiff was trained as a mechanic on missile systems and, at times, supervised up to fifty persons. Plaintiff designed training programs for missile and aircraft systems, but plaintiff never designed pilot training programs, nor did he put together any specific manuals for pilot training. In 1982, while in the military, plaintiff received his only education in instructional technology, which consisted of a one-week

---

1. The court construes the facts in the light most favorable to plaintiff as the non-moving party pursuant to Fed.R.Civ.P. 56.

course in instructional systems design, followed by a one-week course in instructional management. Plaintiff had more than three years of instructional development experience in the military.

Plaintiff obtained an Associate's Degree in 1980 in aviation management and Bachelor's Degree in 1983 in industrial management from Newman College in Wichita, Kansas. Plaintiff took no courses at Newman that dealt with instructional technology. Plaintiff received a Master's Degree in 1984 in human relations and management from Webster University, where he took no courses in instructional technology or design.

Following plaintiff's retirement from the military, he worked for a Hilton hotel as a night manager for eight months. Thereafter, plaintiff worked at Beech Aircraft Corporation as an instructional designer at Beech's pilot training center for seven months, where he gained additional instructional development experience. In 1987, defendant acquired the Beech training center operation where plaintiff worked and, as a result, plaintiff became employed by defendant. Jim Boots became the manager of the training center pursuant to the acquisition.

Plaintiff's initial job was to keep the interactive video system running, which involved primarily computer work, and he was classified as a ground instructor. Plaintiff began helping instructors who were having problems with their computers, a task which ultimately became part of plaintiff's job responsibilities.

Following his work with the interactive video systems, plaintiff assisted a co-worker with the Piaggio (an Italian airplane) training manuals, then worked on piston airplane manuals, and later formatted the Starship manual. For the most part, plaintiff's work on the manuals consisted of performing a desk top publishing function, meaning that he input various materials and data into the computer to create the manuals. At some point, Mr. Boots told plaintiff that plaintiff was not an instructional system designer (ISD).

Plaintiff asked in late 1996 that his title and job description be changed from ground instructor. Mr. Boots sought plaintiff's assistance in formulating a new job description, but plaintiff declined to participate in the process. In the end, Karyn Sissom, plaintiff's supervisor at the time, formulated plaintiff's job description since plaintiff had refused to assist. Plaintiff was given the job description for an Instructional Systems Support Specialist, and plaintiff has since never requested that he be provided with a new job description.

### B. The First CIT Position

Defendant created a Center Instructional Technologist (CIT) position in 1995. The CIT is a curriculum development position, the purpose of which is to design training programs and to develop curriculum in light of and in conjunction with accepted human learning theory models. The CIT duties were listed as follows: 1) resident instructional development expert, 2) reports to director of training, 3) develops and maintains training materials, 4) assists DOS in quality control, and 5) coordinates with ISO, TSO and external support vendors. The requirements were set forth as follows:

> Pilot training firm is seeking individual with master's degree in Instructional Technology or related field and 3 years of related instructional development experience that includes application of instructional systems development; or a doctoral degree and 1 year of related experience; or equivalent combination of education and experience. Strong computer skills required.

Defendant utilized a board to interview and select potential candidates for the CIT position. The board consisted of eight directors and managers of various divisions. Boards had been utilized at the training center before the CIT position was created, and boards had been used to fill posts other than instructor positions.

Initially, Mr. Boots remarked that plaintiff had been doing similar functions and that he expected plaintiff to apply for the position, but upon further review of the job description, Mr. Boots believed that the position was of a much higher grade level and called for higher qualifications that he originally envisioned, and that upper management wanted an individual well-versed and trained in the curriculum development process, not a computer technologist or troubleshooter.

Plaintiff applied for the CIT position by submitting a cover letter and resume. Plaintiff provided no other materials in support of his application for the position. After the candidates were narrowed, the board interviews were held. Prior to the interviews, each candidate was sent a letter telling them to address a number of specific topics at their interview and that each candidate would have at least thirty minutes to make their presentation. Plaintiff was among those candidates invited to interview before the board.

During his interview, plaintiff gave only a vocal presentation, using no overheads or power point, and he chose not to utilize an outline. When asked how he prepared for his interview, plaintiff replied that he had given the company ten years of service and that the company should know what he has done. When asked by the board if he was going to give a presentation, plaintiff replied "you all know what I can do." In fact, plaintiff did not bring his letter outlining the topics he should address, so Mr. Boots offered to let plaintiff refer to his (Boots's) copy of the letter to aid his presentation. In sum, plaintiff concedes he had little or no presentation, was basically unprepared, and gave no vision or plan for the CIT position.

The board rated plaintiff last among the candidates and recommended Dr. Walt Chappell to fill the first CIT position. Dr. Chappell had a Ph. D. in instructional technology, specific work experience in the field, and gave a good presentation to the board that included a clear plan for the CIT position. The board's recommenda-

tion was approved, and Dr. Chappell assumed the CIT position on December 12, 1995.

Dr. Chappell assumed the position of plaintiff's supervisor, but Dr. Chappell and plaintiff did not get along well. By his own admission, plaintiff objected to being supervised by Dr. Chappell, and the two engaged in several verbal confrontations. In the end, Dr. Chappell irritated members of management and others at the instructional systems division, so Dr. Chappell's employment was terminated after seven months.

## C. The Second CIT Position

After the CIT position became vacant a second time, the requirements and qualifications, which were the same, were posted. Plaintiff submitted a cover letter and resume and, as before, plaintiff was sent a letter telling him to address a number of specific topics at his interview.

Shortly before plaintiff had applied for the second CIT position, Nick Frisch, a Piston Program Manager and member of the first CIT board, told plaintiff that it looked like he (Frisch) was the prime candidate for the CIT position and wanted to know if he and plaintiff could work together. Mr. Frisch never indicated that he had been told he was the prime candidate, nor did Mr. Frisch say he had been promised the position.

Plaintiff interviewed before the second CIT board and, once again, offered no overhead or power point presentation and told the board that management should know what he has done. Plaintiff formulated no written plan or handout, nor did he prepare an outline for his presentation, but plaintiff did discuss what an ISD person would do. Then, before final selection of the second CIT was made, Bill Lewandowski, the head of Training Systems Division, interviewed the candidates. Mr. Lewandowski thought that plaintiff did not have a good understanding of the ISD process or human learning theory. Plaintiff, however, recalls that he gave a good

description of the ISD process but believes he was at a disadvantage explaining the human learning theory compared to the other candidates who were younger and more recently educated.

Both Mr. Lewandowski and the second CIT board recommended Mr. Frisch for the position. Mr. Frisch, a pilot, has a B.B.A. in aviation management from Wichita State University. As the Piston Program Manager, and previously as an instructor at defendant's training center, Mr. Frisch developed simulator lesson plans, flight lesson plans, and ground school lesson plans. Mr. Frisch had seven years experience in management at the training center while developing an aircraft program and nine years experience in developing curriculum and lesson plans. Plaintiff leaves uncontroverted the fact that Mr. Frisch's selection "was recommended and approved because of his educational background, and managerial, instructional and curriculum development experience at FlightSafety and good track record with the Company. In addition, Mr. Frisch gave a strong presentation in front of the Board and provided a specific vision for the position." (Plaintiff's Response to Defendant's Uncontroverted Fact ¶ 96).

After Mr. Frisch was selected for the CIT position, plaintiff complained that the selection was discriminatory, and an investigation by the human resource department ensued. Tom Riffe, director of human resources, investigated the allegations by interviewing plaintiff and several of plaintiff's fellow employees. Mr. Riffe requested that plaintiff provide him with any other information or materials that would support his discrimination allegations and also requested any written materials that would tend to show plaintiff's qualifications. By his own admission, plaintiff never responded to Mr. Riffe's requests because plaintiff had decided that Mr. Riffe's investigation was biased. In January 1997, Mr. Riffe sent plaintiff a memo detailing his investigative findings and concluded that plaintiff had not been discriminated against.

Mr. Frisch assumed the CIT position and became plaintiff's supervisor. Plaintiff admits that he had a poor relationship with Mr. Frisch and that he didn't feel it was appropriate for Mr. Frisch to supervise him. The two exchanged various memos about Mr. Frisch's perception that plaintiff was refusing to be supervised by him. In March 1997, plaintiff told Mr. Boots that he thought it best that he not be supervised by someone who admitted having racial tendencies. Plaintiff was referring to a conversation between plaintiff and Mr. Frisch that occurred in August 1996, when Mr. Frisch was not plaintiff's supervisor, where Mr. Frisch told plaintiff that he had worked hard to overcome his prejudices, and that while he may have been prejudiced in the past, he strives to see all people as equal. By plaintiff's own admission, Mr. Frisch never indicated in any other conversation that he had racist tendencies, nor did Mr. Frisch do anything to plaintiff that was racially derogatory after the August 1996 conversation. After March 1997, Mr. Frisch was pulled from being plaintiff's supervisor, and plaintiff was put under David Louie.

David Louie, the Computer Network Administrator, became plaintiff's supervisor. Mr. Louie testified that he had problems with plaintiff and requested that he be relieved from supervising plaintiff. Mr. Louie was removed as plaintiff's supervisor because, plaintiff was told, Mr. Louie was not doing his job. Karyn Sissom was then assigned to supervise plaintiff, whom plaintiff characterized as overbearing.

### D. Plaintiff's First EEOC Charge

Plaintiff filed his first charge of discrimination with the EEOC in April 1997. The charge itself contained allegations only in reference to Mr. Frisch's hire. Plaintiff now brings forth an affidavit, which is unsworn, that he allegedly provided to the EEOC. The unsworn EEOC affidavit does make reference to the hiring of Dr. Chappell for the first CIT position.

## E. Harassment Allegations Against Plaintiff

In May 1997, Mr. Boots received a report from two female employees that plaintiff had been touching them inappropriately. Both employees indicated that plaintiff would, over a period of several months, touch or stroke their hair or rub their neck or shoulders. Mr. Boots and Ms. Sissom held a conference with plaintiff about inappropriately touching the female employees. At the time, plaintiff did not deny that he touched the female employees but denied that he did it with any sexual intent. Plaintiff believes that the harassment allegations were simply trumped up in order to make him look bad and to further justify the fact that he was denied the CIT position, but plaintiff admits that he has no information or specific facts to support this contention.

## F. The Third CIT Position

Mr. Frisch elected to leave his CIT position in the spring of 1998. As before, the job opening was posted, plaintiff submitted a cover letter and resume, and plaintiff received a letter telling him what topics the board wanted addressed during the board interview. During the interview, plaintiff gave only a verbal presentation and did not supply any other materials or use any visuals. Likewise, plaintiff did not present a plan for the CIT position except in response to questions asked by the board.

The board recommended that Suzanne Drazil be selected for the third CIT position. Ms. Drazil had an associate's degree in instructional technology, an associate's degree in aerospace physiology technology, and a bachelor's degree in management with a concentration in health care. Ms. Drazil had taken specific courses on the ISD model, served as an instructor on aerospace physiology in the Air Force for over six years, and developed training curriculum, including a training matrix and lesson plans in the school of aerospace medicine. Ms. Drazil also instructed utilizing a flight simulator and designed a training program for a quality awareness course in the military. Her specific instructional technology training has occurred since 1991.

After the board made its recommendation, Mr. Lewandowski again interviewed the candidates. Plaintiff does not recall what specific questions were asked during the interview except that he was asked about human learning theory. After interviewing plaintiff, who once again could not address some of the questions posed, Mr. Lewandowski did not recommend plaintiff for the CIT position and instead recommended Ms. Drazil. Ms. Drazil was hired as the CIT. Defendant contends that Ms. Drazil was hired because of her educational background, including a specific degree in instructional technology, her background and experience in curriculum development, working with the ISD process in the military, her more recent ISD experience, and her strong presentation to the third CIT board.

## G. The Assistant Manager's Position

Plaintiff had first expressed an interest in the Assistant Manager's position in 1993 after he learned that the position might be filled. Mr. Boots, however, later announced that the position would not be filled and that new guidelines on the job requirements would be forthcoming. Besides plaintiff, another employee who was white also expressed an interest in the position at that time.

Sometime in 1995, a new job description was developed for the assistant manager, and Mr. Boots sought to fill the position. The position was not posted, which according to company policy defendant was free to do. Rather, Mr. Boots recommended Marlin Schaefer be appointed Assistant Manager and, after being interviewed by defendant's president, Mr. Schaefer was appointed Assistant Manager under Mr. Boots. Soon thereafter, Mr. Boots retired, and Mr. Schaefer was appointed the new Center Manager in December 1997.

## H. Plaintiff's Work History

### 1. Plaintiff's Evaluations

Plaintiff considers every evaluation he received from defendant to be "bogus" because he was being evaluated as an instructor instead of someone in an ISD position. In any event, as a matter of course, once plaintiff received a copy of his evaluation, he was to fill out the performance goals for the coming year and have them ready before he sat down to talk with his supervisor about the evaluation. In his 1995 evaluation, plaintiff timely filled out his performance goals and received a rating 91.90%.

In November 1996, plaintiff initially refused to fill out his performance goals after receiving his evaluation, in which he was rated 87%. At some point, plaintiff was requested to fill out his performance goals and, only then, did plaintiff fill out the body of the performance goals sheet. On his next evaluation in 1997, plaintiff's supervisor ended up filling out his goals for plaintiff although he disagreed with them. Plaintiff eventually filled out some goals because he was "probably pushed into doing it" and told his supervisor that he did not want to fill out the performance goals again. Plaintiff was rated 72.5% on that evaluation. After a change in evaluation format, plaintiff scored on his most recent evaluation 36 out of 60 points by Ms. Sissom and 28 out of 60 points by Ms. Drazil.

### 2. Plaintiff's Attendance

Plaintiff was to arrive at work by 7:30 a.m. each day to insure that the computers and associated software were functional at 8:00 a.m. when classes start. Plaintiff was counseled about keeping prompt hours as far back as March 20, 1995. There is evidence in the record that plaintiff was late to work on July 29, 1997. Specifically, plaintiff was still at home when a computer went down and classes had to start without the computer. Plaintiff was counseled at that time about being prompt, and plaintiff confirmed his understanding that he should arrive at work on time to insure classroom computer readiness. From evidence in the record, the court calculates that plaintiff was late at least twelve times between August 1997 and July 1998 and was counseled on several different occasions, though plaintiff recalls only one instance when he was tardy. Other employees, who are white, have been counseled about tardiness and keeping proper work schedules.

With respect to one of the instances when plaintiff was late, Dan Orlando, a manager at the plant, sent an e-mail to Ms. Sissom on March 10, 1998, which stated the following:

> Karyn,
>
> Monday 3–9–98 Bill Hall entered the center at 7:55 AM. This is not the day (Monday) when he needs to be late. Don't say anything, just log it, we don't want to give the appearance of retaliation. We must be very careful.

## I. Plaintiff's Second EEOC Charge

Plaintiff filed his second charge of discrimination with the EEOC on October 9, 1998. The charge and accompanying sworn affidavit contains allegations of race, sex, and age discrimination in the hiring of Ms. Drazil for the third CIT position. Plaintiff also alleged retaliation and a hostile work environment. On October 21, 1998, plaintiff received a Notice of Right to sue on the charge.

## II. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) *(citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the prop-

er disposition of the claim." *Id.* (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (*citing Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *See id.* at 671 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *See Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (*quoting* Fed.R.Civ.P. 1).

## III. Discussion

At the outset, the court must determine whether plaintiff can proceed on the claims arising out of his second EEOC charge. The court will then address each promotion at issue and plaintiff's claims of disparate treatment, hostile work environment, and retaliation.

### A. Plaintiff's Second EEOC Charge

#### 1. Title VII

■ Defendant argues that plaintiff's claims under Title VII for sex and race discrimination arising out of the second EEOC charge are barred in their entirety. At issue is whether plaintiff prematurely amended his complaint in violation of the time requirements set forth in Title VII and corresponding regulations.

Pursuant to his first charge with the EEOC, plaintiff filed suit in federal court in February 1998. Plaintiff then filed his second charge with the EEOC on October 9, 1998. On October 21, 1998, plaintiff received a Notice of Right to Sue from the EEOC on that charge. The Notice stated, "Less than 180 days have passed since the filing of this charge, but … it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge," and that "[t]he EEOC is terminating its processing of this charge." In November 1998, plaintiff amended his complaint to include those allegations contained in the second EEOC charge.

The enforcement provisions of Title VII state that if the EEOC dismisses a charge, or if within 180 days from the filing of such charge the EEOC has not filed a civil action, whichever is later, the EEOC shall notify the person aggrieved that a civil action may be brought within 90 days. *See* 42 U.S.C. § 2000e–5(f)(1). Congress enacted this provision to protect aggrieved individuals from undue delay. Defendant argues that the court lacks jurisdiction over the claims because plaintiff amended

his complaint before 180 days had passed from the filing of the second charge.

The EEOC is authorized pursuant to 29 C.F.R. § 1601.28(a)(2) to issue a right to sue notice before 180 days elapse. The Tenth Circuit has not addressed the issue of whether the regulation promulgated under 29 C.F.R. § 1601.28(a)(2) is valid in light of the language found in 42 U.S.C. § 2000e–5(f)(1). Other circuits have, however, addressed the issue. In *Martini v. Federal Nat'l Mortgage Ass'n*, 178 F.3d 1336, 1348 (D.C.Cir.1999), the District of Columbia Circuit held that a right-to-sue notice issued before the expiration of the 180-day period is invalid and the resultant lawsuit, untimely. At least one district court within the Tenth Circuit has followed *Martini. See Shepherd v. United States Olympic Comm.*, 94 F.Supp.2d 1136, 1145 (D.Colo.2000).

At least three other circuits have issued opinions contrary to *Martini*, holding that when the EEOC issues a right-to-sue letter prior to the expiration of the 180-day period, such premature issuance does not preclude the immediate filing of a federal lawsuit. *See Sims v. Trus Joist MacMillan*, 22 F.3d 1059, 1061 (11th Cir.1994); *Brown v. Puget Sound Elec. Apprenticeship & Training Trust*, 732 F.2d 726, 729 (9th Cir.1984); *Weise v. Syracuse Univ.*, 522 F.2d 397, 412 (2d Cir.1975). The rationale of those courts is persuasive. The purpose of the 180 day-period is to protect the aggrieved party from administrative backlog. Moreover, where the EEOC determines that it cannot investigate a charge within the 180-day period, and subsequently notifies the aggrieved party that it is terminating its investigation, it is pointless for the aggrieved party to stand by until the 180-day period expires. *See Sims*, 22 F.3d at 1061.

■ Especially applicable to the case at hand is the Second Circuit's decision in *Weise*. In *Weise*, the EEOC issued a right-to-sue letter only three days after the filing of the plaintiff's second charge against the same employer. The Second Circuit reasoned:

[I]n this case there was a prior charge against the same employer that had been pending for more than the required time, and it was clear that no conciliation was likely. There was thus little reason to think that the second charge alleging a continuous course of discrimination would have ended in conciliation. To require the EEOC to hold the second charge for 180 days would not have advanced the conciliation purposes of the Act and would only have served to delay the proceedings, contrary to the Act's policy of handling claims expeditiously.

*Weise*, 522 F.2d at 412. In the case at hand, the plaintiff's lawsuit was pending in federal court at the time he filed his second charge with the EEOC. Twelve days after he filed the second charge, the EEOC sent plaintiff a right-to-sue letter and informed plaintiff that it would be unable to process the charge within 180 days and that it was terminating its proceedings. To require plaintiff to wait the 180 days to amend his complaint would not only have been futile, but also contrary to the stated intent of Title VII—the expeditious resolution of claims.

■ Defendant also contends that plaintiff failed to adhere to the 60-day deferral period set forth in the enforcement provisions of Title VII. At issue is 42 U.S.C. § 2000e–5(c), which provides in pertinent part:

In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (a) of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such pro-

ceedings have been earlier terminated
. . .

42 U.S.C. § 2000e–5(c). Kansas is such a deferral state, and thereby requires plaintiff to exhaust his state administrative remedies with the Kansas Human Rights Commission (KHRC) before filing with the EEOC and giving the state an exclusive 60–day deferral period to complete its investigation. *See Morris v. State of Kan. Dep't of Revenue,* 849 F.Supp. 1421, 1427 (D.Kan.1994).

An aggrieved party in Kansas may file charges with the EEOC and rely on the EEOC to refer the charges to the KHRC. In this case, plaintiff filed directly with the EEOC. However, neither party brings forth evidence regarding whether the EEOC referred the charges to the KHRC, and, if so, whether the KHRC investigated the charges and subsequently terminated its proceedings concurrently with the EEOC. Nor does either party make part of the record the possible existence of a worksharing agreement between the KHRC and the EEOC, evidence of which could aid the court in determining whether filing with the EEOC (and the EEOC's subsequent termination of the proceedings) was, by itself, enough to satisfy the statute.

Notwithstanding the absence of such information, the court still finds that plaintiff was justified when he amended his complaint prior to the expiration of 60 days. The EEOC sent plaintiff a right-to-sue letter, informing plaintiff that he could sue in federal court within 90 days and that the EEOC was terminating its processing of the charge. The EEOC was aware that plaintiff had litigation already pending in federal court because the second charge so stated. In such circumstances, a reasonable person would justifiably rely on the EEOC to know the preconditions to issuing a right-to-sue letter. And since the time limitations of § 2000e–5 are subject to waiver and estoppel, *see Biester v. Midwest Health Servs., Inc.,* 77 F.3d 1264, 1267 (10th Cir.1996), the court finds that the plaintiff in this case was entitled to rely on the EEOC's information that he could sue. To hold otherwise would force plaintiffs in this situation to question whether the EEOC had properly handled their charge of discrimination with the KHRC before they brought suit. *See Gaddy v. Four B Corp.,* 953 F.Supp. 331, 336 n. 8 (D.Kan.1997). Title VII does not place such an onerous burden on a plaintiff. *See id.* Accordingly, the court holds that plaintiff timely filed his amended complaint to include those allegations under Title VII set forth in his second EEOC charge.

**2. ADEA**

■ The issue of whether plaintiff timely filed his amended complaint adding his claims under the ADEA, however, differs from plaintiff's Title VII claims. In the second EEOC charge, plaintiff included claims that he was discriminated against on the basis of his age. The Notice of Right to Sue issued twelve days later included the following provision: "You may sue under the ADEA at any time from sixty days after the charge was filed until 90 days after you receive notice that we have completed action on the charge." The following paragraph was then checked: "The EEOC is closing your case." Thus, there was no information provided by the EEOC on which plaintiff could have justifiably relied in filing early. Rather, plaintiff had notice that he could not file until 60 days after the charge was filed.

Moreover, the enforcement provisions of the ADEA differ somewhat from Title VII. While both contain a similar 60–day deferral provision, *compare* 42 U.S.C. § 2000e–5(c) *with* 29 U.S.C. § 633(b), the ADEA additionally provides: "No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]." 29 U.S.C. § 626(d). In light of this clear statutory mandate, the court finds that plaintiff, in filing his amended complaint before sixty days had passed from the filing of his second

charge, cannot pursue his claims under the ADEA in this lawsuit. Those claims are hereby dismissed.

## B. First CIT Position

Plaintiff claims that defendant discriminated against him on the basis of his race by hiring Dr. Chappell, a white male, for the first CIT position. Plaintiff contends that defendant violated 42 U.S.C. § 1981, as amended, 42 U.S.C. § 1981a, and Title VII.

### 1. 42 U.S.C. § 1981

■■■ Defendant moves for judgment as a matter of law on the grounds that plaintiff's § 1981 claim is barred by the statute of limitations. In this case, the two-year statute of limitation set forth in Kan.Stat.Ann. § 60–513(a)(4) applies. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660–62, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) (the forum state's statute of limitations for personal injury actions provides appropriate limitations period for claims under § 1981). Plaintiff asserts that his claim is subject to the four-year statute of limitations set forth in 28 U.S.C. § 1658, which was enacted in 1990, and provides that civil actions arising under an Act of Congress enacted after § 1658 are to be governed by a four-year statute of limitations. Plaintiff argues that, since § 1981 was amended in 1991, his cause of action arose under an Act of Congress that was enacted after § 1658 and, therefore, the four-year statute of limitations applies. The court disagrees.

For support, plaintiff cites *Alexander v. Precision Machining, Inc.*, 990 F.Supp. 1304 (D.Kan.1997), wherein the court held that the four-year statute of limitations set forth in § 1658 should apply to § 1981 claims. Several courts in this district have expressly rejected *Alexander*, reasoning that an amendment to § 1981 does not constitute "an Act of Congress enacted" after § 1658. Accordingly, those courts held that the two-year statute of limitations applies in § 1981 cases. *See, e.g., Lasley v. Hershey Foods Corp.*, 35 F.Supp.2d 1319, 1321 (D.Kan.1999); *Mo-*

*hankumar v. Dunn*, 59 F.Supp.2d 1123, 1131 (D.Kan.1999). This approach has been recognized by the Tenth Circuit as appropriate. *See Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1110–11 (10th Cir.1998) (applying Colorado's two-year statute of limitations where claim stemmed from amended version of § 1981).

In this case, Dr. Chappell assumed the CIT position in December 1995. Plaintiff filed this lawsuit in February 1998. Accordingly, plaintiff's § 1981 claim with respect to the first CIT position is barred by the statute of limitations.

### 2. Title VII

■■■ Defendant contends that plaintiff's Title VII claim regarding the first CIT position is barred because plaintiff failed to timely file a charge of discrimination. The court agrees. Exhaustion of administrative remedies is a prerequisite to instituting a Title VII action in federal court. *See Khader v. Aspin*, 1 F.3d 968, 970 (10th Cir.1993). A complainant must file a charge with the appropriate state or local agency, or have the EEOC refer the charge to that agency, within 240 days of the alleged discriminatory event to ensure that the claim may be filed with the EEOC within the 300–day limit set forth in Title VII. *See E.E.O.C. v. Commercial Office Prods. Co.*, 486 U.S. 107, 110, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); *Waller v. Consolidated Freightways Corp. of Del.*, 767 F.Supp. 1548, 1558 (D.Kan.1991). In a deferral state such as Kansas, a plaintiff must file Title VII discrimination charges within 300 days after the alleged discriminatory act occurred. *See Peterson v. City of Wichita, Kan.*, 888 F.2d 1307, 1308 (10th Cir.1989). In the case at hand, plaintiff filed his first charge of discrimination in April 1997, yet the selection of Dr. Chappell for the first CIT position occurred in 1995. Having failed to file a charge of discrimination within 300 days of Dr. Chappell's selection, plaintiff's Title VII claim with respect to the first CIT position

is barred for failure to exhaust administrative remedies.

## C. Second CIT Position

Plaintiff claims that he was denied the second CIT position because of his race and age. Having dismissed plaintiff's claims under the ADEA, the court considers plaintiff's allegation that the hiring of Nick Frisch was racially motivated.

The court applies the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* framework, in order to survive summary judgment, the plaintiff must first establish a prima facie case of discrimination. If the plaintiff carries that burden, the defendant must then articulate a facially nondiscriminatory reason for the challenged employment action. If the defendant makes such a showing, the burden reverts to the plaintiff to prove the proffered nondiscriminatory reason is pretextual.

■ To carry the initial burden of establishing a prima facie case of racial discrimination for failure to promote, the plaintiff must show that he 1) belongs to a minority group; 2) was qualified for the promotion; 3) was not promoted; and 4) that the position remained open or was filled with a non-minority. *See Reynolds v. School Dist. No. 1, Denver Colo.*, 69 F.3d 1523, 1534 (10th Cir.1995). Defendant concedes, for purposes of the present motion, that plaintiff has established a prima facie case.

The burden thus shifts to the defendant to articulate a nondiscriminatory reason for the hiring of Mr. Frisch. Defendant proffers and, significantly, plaintiff does not controvert, that Mr. Frisch's hire was recommended and approved because of his educational background, his managerial, instructional and curriculum development experience at FlightSafety, his good track record with the company, and his strong presentation in front of the Board, providing a specific vision for the position. Defendant further submits that Mr. Frisch had been a successful member of management at FlightSafety, had built a training program from scratch, and had specific instructional development experience in developing courseware and curriculum. Mr. Frisch had a degree in management and, as plaintiff concedes, more recent ISD training. Mr. Frisch met the requirements for the job description, which stated that an applicant may qualify for the position given an equivalent combination of education and experience. Thus having articulated nondiscriminatory reasons for Mr. Frisch's hire, reasons which plaintiff concedes, the burden reverts to plaintiff to prove the proffered nondiscriminatory reasons are pretextual.

■ Evidence of pretext may include, but is not limited to, the following: prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria. *See Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999). Significant to this court, plaintiff concedes that he has no information that either the second CIT Board, Mr. Lewandowski, or Mike Lee, who ultimately approved Mr. Frisch's selection, was biased against him. Instead, plaintiff points to the following as evidence of pretext: 1) plaintiff meets the educational and experience qualifications for the position; 2) plaintiff has had numerous management positions in the military and at the Hilton, along with some accounting and cost control functions, 3) plaintiff was the only black employee with a high profile around clients; 4) plaintiff was the only black person that applied for the position; 5) plaintiff is the only person who has been performing many of the jobs functions of the CIT position; and 6) plaintiff has ISD experience. Plaintiff also cites Mr. Frisch's comment before the selection that he (Frisch) con-

sidered himself the prime candidate for the position.

■ Even viewing these facts in the light most favorable to the nonmoving party, the court finds that the plaintiff has failed to establish pretext. None of the evidence cited by plaintiff raises a question of fact regarding the falsity of defendant's articulated reasons for hiring Mr. Frisch. Plaintiff's evidence merely shows that plaintiff may indeed have been qualified for the position, a fact which is not sufficient for plaintiff's claims to survive summary judgment since Mr. Frisch was also clearly qualified. Even if plaintiff had established that he was more qualified than Mr. Frisch, the court must assume that those who did the hiring knew what particular qualifications and experiences were necessary for the particular job. *See Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 (10th Cir.1993). The court is not in the business of determining whether an employer acted prudently in its hiring decisions, and evidence that demonstrates poor business judgment does not itself establish pretext. *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (assertion that plaintiff was equally or more qualified than person retained is insufficient to prove pretext).

■ As for Mr. Frisch's comment, plaintiff has failed to show this court that Mr. Frisch was promised or guaranteed the position. However, even if Mr. Frisch was promised the position, plaintiff offers no evidence that such a promise or guarantee was based on plaintiff's race, which is required to be actionable under Title VII. *See Taken v. Oklahoma Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir.1997) ("Favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification.").

Plaintiff's claim boils down to his belief that he was denied the second CIT position because of his race. Such subjective beliefs are insufficient to survive summary judgment. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1408 n. 7 (10th Cir.1997).

Accordingly, defendant is granted summary judgment on plaintiff's claims under Title VII and § 1981 with respect to the second CIT position.

### D. Third CIT Position

Plaintiff claims that he was denied the third CIT position because of his race, age, and sex. Because the court determined that plaintiff has no actionable ADEA claim in this case, it will consider plaintiff's allegations of racial and sexual discrimination with regard to the hiring of Ms. Drazil.

The court again applies the *McDonnell Douglas* burden shifting analysis. Accordingly, the defendant, having conceded that plaintiff established a prima facie case, must articulate a nondiscriminatory reason for the hiring of Ms. Drazil. Defendant proffers that Ms. Drazil was hired because of her educational background, which included a degree in instructional technology and a degree in management, and her background and experience in curriculum development and working with the ISD process in the military. Defendant further submits that Ms. Drazil had recent ISD experience, had designed training programs in the military, and gave a strong presentation to the third CIT board. The court finds that defendant has adequately articulated nondiscriminatory reasons for Ms. Drazil's hire. The burden thus reverts back to plaintiff to prove the proffered nondiscriminatory reasons are pretextual.

Plaintiff's evidence of pretext consists of comparing his qualifications with Ms. Drazil's. Plaintiff argues that his educational background, training, and experience exceed those of Ms. Drazil. Yet Ms. Drazil had a specific degree in instructional technology, her ISD training was more recent than plaintiff's, she had worked in the ISD field, and had actually developed a training program using the ISD model. Plaintiff may have been qualified for the CIT position, but Ms. Drazil's education, training, and experience also adequately qualified

her for the position. As such, the court will not substitute its business judgment for defendant's. *See Branson*, 853 F.2d at 772.

■ Plaintiff also contends that items such as his "appearance" and "communication skills" were subjective elements that played a role in his not obtaining the CIT position.[2] Plaintiff is correct in pointing out that the use of subjective criteria may be evidence of pretext if there is a showing of significant disparity in the representation of a particular group. *See Lujan v. Walters*, 813 F.2d 1051, 1057 (10th Cir. 1987). However, the Tenth Circuit has recognized that subjective criteria play a legitimate role in employment decisions. *See Burrus v. United Tele. Co. of Kan., Inc.*, 683 F.2d 339, 342 (10th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). In particular, subjective evaluations that a plaintiff lacks the ability to supervise or get along with others can be legitimate factors to consider. *See id.* In this case, if defendant utilized factors such as plaintiff's appearance or communication skills in denying him the CIT position, the court finds that such factors played a legitimate role in defendant's decision. Good communication skills, for example, would have been essential in a supervisory position such as CIT, and defendant may have been legitimately concerned given plaintiff's past problems getting along with his supervisors and plaintiff's admitted unpreparedness during his board interview.

■ The court finds no evidence that defendant's proffered reasons for selecting Ms. Drazil were merely a pretext for discrimination. Indeed, plaintiff concedes that he has no information that any member of the third CIT board or Mr. Lee was prejudiced against him on the basis of his race or sex. Without any such evidence in the record, plaintiff's claim fails as a matter of law. Accordingly, the court grants summary judgment to defendants on plain-

tiff's claim that he was discriminated against on the basis of his race in violation of Title VII and § 1981, and sex in violation of Title VII, in the hiring of Ms. Drazil for the third CIT position.

### E. Assistant Manager Position

#### 1. Title VII

Plaintiff contends in this lawsuit that he was not selected in December 1997 for the Assistant Manager's position because of his race. Specifically, he contends that he was discriminated against on the basis of his race and that he was not selected for the position in retaliation for the filing of his previous charge of discrimination. Defendant argues that this court lacks jurisdiction over this claim because plaintiff did not contend in his second EEOC charge that he failed to receive the Assistant Manager position.

■ The court lacks jurisdiction to entertain a Title VII claim not previously filed with the EEOC. *See Seymore v. Shawver & Sons. Inc.*, 111 F.3d 794, 799 (10th Cir.1997). Claims that are reasonably related to claims included in the EEOC charge may be asserted, however, with the critical inquiry being whether the claims set forth in the complaint "fall within the scope of the investigation that could reasonably be expected to grow out of the EEOC charges." *Harrell v. Spangler*, 957 F.Supp. 1215, 1219 (D.Kan.1997). Upon careful review of the second EEOC charge, the court agrees with defendant that the charge does not include any allegation that plaintiff failed to receive the Assistant Manager's position because of his race. In fact, nowhere in plaintiff's second EEOC charge does he even mention the Assistant Manager's position. If plaintiff thought that he was not selected for the Assistant Manager's position because of his race, he could have, and indeed should have, included the allegation

---

**2.** Plaintiff fails to show where it states in the record that defendant took those factors into consideration. Giving plaintiff the benefit of

all reasonable inferences, however, the court considers plaintiff's argument.

in the charge along with the discrimination allegation regarding the third CIT position. *See Chaudhuri v. Kansas State Univ.*, No. 98–4005–DES, 1999 WL 99309, at *3 (D.Kan. Jan.19, 1999). Plaintiff's claims of racial discrimination regarding the Assistant Manager's position do not fall within the scope of the investigation that could reasonably be expected to grow out of the second EEOC charge. As such, the court hereby grants summary judgment to defendant on plaintiff's Title VII claim of discrimination for lack of jurisdiction.[3]

### 2. 42 U.S.C. § 1981

■ Because § 1981 does not require exhaustion of administrative remedies, the court considers plaintiff's claim of racial discrimination under § 1981 with respect to the Assistant Manager position. The court invokes the same analytical framework applicable to Title VII cases, which is the *McDonnell Douglas* burden-shifting test. *See Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir.1999). Assuming for the sake of the present motion that plaintiff has established a prima facie case, the court concludes that plaintiff has shown no evidence of pretext.

Defendant asserts, and plaintiff does not controvert, that Mr. Schaefer was qualified to fill the position from an administrative, marketing, and financial standpoint. Mr. Schaefer had a Master's Degree in management and previously had held management positions in the military and with defendant. In fact, Mr. Schaefer had served as Assistant Manager in Mr. Boots's absence. Mr. Boots further testified that he harbored concerns about plaintiff's performance in the areas of his un-

cooperative and negative attitude, his chronic lateness, and declining evaluations. Mr. Boots was also concerned about plaintiff's resistance to filling out his performance goals or assisting in the preparation of his new job description. Likewise, Mr. Boots was concerned about how plaintiff would have interacted with other management personnel given plaintiff's history of conflicts with his supervisors. In sum, defendant articulated nondiscriminatory reasons for hiring Mr. Schaefer.

In response, plaintiff fails to produce even a scintilla of evidence that defendant's articulated reasons are not worthy of belief. Indeed, plaintiff's response to the present motion lacks an argument, let alone evidence that would tend to show, that defendant's reasons are pretextual. For this reason, defendant's motion is granted as to plaintiff's § 1981 claim of racial discrimination in filling the Assistant Manager position.

### F. Disparate Treatment Claim

### 1. Title VII

■ As best the court can discern, plaintiff raises a disparate treatment claim. Defendant asserts that the claim has not been raised in plaintiff's amended complaint and should not, therefore be added at this stage. After reviewing plaintiff's amended complaint, the court notes that plaintiff made a vague reference to such a claim. (Amended Complaint, ¶ 41 ("[P]laintiff is criticized and harassed about the smallest of matters and generally treated adversely and much differently than the white employees.")). Fatal to plaintiff's disparate treatment claim, how-

---

**3.** With respect to the retaliation claim, (the merits of which will be discussed more fully in Section III(H) of this opinion), plaintiff alleged in his second EEOC charge that he was not selected for the third CIT position in retaliation for having filed a previous EEOC charge. Importantly, plaintiff also included a general allegation of retaliation, in which he stated "Ever since I filed my original EEOC charge, above mentioned, Respondent has retaliated against me." The court finds that the

allegation of retaliation asserted in this lawsuit with respect to the Assistant Manager's position was reasonably related to the general retaliation claim set forth in plaintiff's second EEOC charge. Put another way, an investigation into plaintiff's claim of retaliation regarding the Assistant Manager's position could reasonably be expected to grow out of plaintiff's general claim of retaliation set forth in his second EEOC charge. As such, the court will consider this claim later.

ever, is the fact that plaintiff failed to include any such allegation in either EEOC charge.

Plaintiff's EEOC charges unambiguously limit his claims to discrimination in failing to promote, retaliation, and hostile work environment. Notably absent from both charges are allegations that plaintiff was treated differently than similarly situated white employees. The incidents underlying plaintiff's disparate treatment claim—that his work arrival times were being monitored and that his evaluation scores were declining—are also not included in either EEOC charge. Accordingly, the investigation into plaintiff's charges would not fall within the scope of, and could not reasonably expected to grow into, an investigation of a claim of disparate treatment. *See Harrell*, 957 F.Supp. at 1219. The court has no jurisdiction and, accordingly, grants summary judgment to defendant on plaintiff's disparate treatment claim under Title VII.

### 2. 42 U.S.C. § 1981

■ Plaintiff's claim of disparate treatment under § 1981 also fails. The court reviews plaintiff's disparate treatment claim under the framework of *McDonnell Douglas. See Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir.1991). Thus, plaintiff must first establish a prima facie case of disparate racial treatment, which requires plaintiff to show that (1) he is a member of a racial minority, (2) he suffered an adverse employment action, and (3) similarly situated employees were treated differently. *See Trujillo v. University of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir.1998).

■ The court finds that plaintiff has failed as a matter of law to bring forth evidence establishing a prima facie case of disparate treatment, which requires plaintiff to show that other employees, with similar responsibilities and who had a similar number and quality of infractions (such as tardiness), were treated differently. Plaintiff has offered no evidence that *any* similarly situated non-minority employee

was treated in a different manner. In contrast, defendant has offered evidence that other employees, who are white, have been counseled in writing about being tardy and timely performing assigned tasks. There is further no evidence in the record that similarly situated non-minority employees were evaluated more favorably than plaintiff. The court determines that plaintiff has failed to establish a genuine issue of material fact as to his disparate treatment claim under § 1981 and, accordingly, grants summary judgment to defendant.

### G. Hostile Work Environment Based on Race

Plaintiff alleges that a continuous hostile work environment against him has existed since Mr. Boots became the manager in 1987. As best the court can discern, plaintiff's allegations comprising his hostile work environment claim are as follows: The first time plaintiff met Mr. Boots in 1987, Mr. Boots asked plaintiff how blacks got along in Wichita. Then, sometime prior to 1995, Mr. Boots approached plaintiff and told him there would be a trainee coming to the plant and that the trainee was black, even though she looked white. Mr. Boots added that the trainee was nice and that plaintiff should meet her. Plaintiff later heard that Mr. Boots had directed other employees not to make any racial statements in front of the trainee. Mr. Boots never mentioned this to plaintiff but later verified that he made the remark. In early 1995, plaintiff heard a former employee use the "n" word on one occasion. The former employee immediately apologized, and plaintiff never told Mr. Boots that the employee had made the remark. In fact, when Mr. Boots subsequently learned of the incident, plaintiff refused to give Mr. Boots the name of the employee when asked. Plaintiff also alleges that he has heard Mr. Boots tell off-color jokes, but plaintiff cannot identify a single joke and further admits that it has been at least three years from plaintiff's

deposition (in October 1998) since he heard Mr. Boots make any such joke.

In addition, plaintiff claims that he has heard racial jokes at work but cannot identify any joke, nor can plaintiff identify who other than two co-employees told a racial joke. Plaintiff never complained to any member of management about racial jokes, nor is plaintiff aware that management knew that racial jokes were being told. Plaintiff occasionally hears racial remarks from clients, but has never reported these remarks to management. A fellow employee has told plaintiff "you people" do this or that, but plaintiff failed to complain about this remark to management.

Plaintiff acknowledges that neither Mr. Boots nor anyone in management has referred to plaintiff in a racially derogatory manner. Plaintiff has never seen any derogatory writings or cartoons at work. Further, another black employee testified that he has never heard any racially derogatory comments. On the other hand, a different black employee testified that she felt it was noticeable when plaintiff was treated different by members of management, like management acting as if they were not listening to plaintiff while he spoke.

### 1. Timeliness of Hostile Work Environment Claim

At issue is whether plaintiff timely filed a charge for hostile environment under Title VII. In his first charge to the EEOC in April 1997, plaintiff did not include a hostile environment allegation. In his second charge in October 1998, plaintiff made the allegation. Thus, plaintiff's claim is timely only with respect to discriminatory acts which occurred within 300 days of the filing of plaintiff's second charge unless plaintiff can either prove that a continuing violation existed or establish equitable tolling. *See Purrington v. University of Utah*, 996 F.2d 1025, 1028 (10th Cir.1993).

### a. Continuing Violation

■ To invoke the continuing violation exception to the Title VII charge-filing

deadlines, plaintiff must show either 1) a series of related acts taken against a single individual, one or more of which falls within the limitations period, or 2) the maintenance of a company-wide policy both before and during the limitations period. *See Bruno v. Western Elec. Co.*, 829 F.2d 957, 961 (10th Cir.1987). The record contains no evidence of a company-wide system of discrimination creating a hostile work environment. Thus, plaintiff must demonstrate that defendant engaged in a series of related discriminatory acts.

To prove a series of related acts, plaintiff must show that the acts rise to the level of a "dogged pattern" of discrimination, as distinguished from "isolated and sporadic outbreaks." *Purrington*, 996 F.2d at 1028 (*quoting Bruno*, 829 F.2d at 961). The Tenth Circuit employs a three-factor inquiry in making this determination: "(i) subject matter—whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence—whether the nature of the violation should trigger an employee's awareness of the need to assert [his] rights." *Mascheroni v. Board of Regents*, 28 F.3d 1554, 1561 (10th Cir.1994). In this case, the alleged violations were discrete, separate acts that appear unrelated and infrequent. Accordingly, the alleged violations that occurred prior to the 300-day filing deadline do not constitute a series of related acts under the Tenth Circuit's inquiry.

### b. Equitable Tolling

■ The timely filing of a discriminatory charge may be equitably tolled where a plaintiff has been "lulled into inaction" by his employer. *Martinez v. Orr*, 738 F.2d 1107, 1110 (10th Cir.1984). Under Tenth Circuit law, this requires that plaintiff show that the defendant engaged in "active deception" which caused his filing to be untimely. *Johnson v. United States Postal Serv.*, 861 F.2d 1475, 1481 (10th Cir. 1988). In this case, there exists no evi-

dence in the record that defendant engaged in deceit, active or otherwise.

Because plaintiff has failed to bring forth facts to support an exception to the charge-filing deadline, the court will consider only those incidents that occurred prior to the 300–day filing period. Likewise, pursuant to the two-year statute of limitation applicable to § 1981, the court will not consider those incidents occurring prior to February 1996 for purposes of its § 1981 analysis.

### 2. Merits of Hostile Work Environment Claim

The court is left to consider those incidents which are not time-barred. The court notes that some of the incidents alleged by plaintiff are not time specific regarding when they occurred. So construing the facts in the light most favorable to the plaintiff, the court will take into consideration all incidents which do not appear on their face to be time-barred. These incidents include racial jokes at work, though plaintiff cannot identify a single joke or who (but for two co-employees) may have told a racial joke, occasional racial remarks from clients, and a fellow employee telling plaintiff "you people" do this or that.

■ To survive summary judgment, plaintiff must show that "the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment … and the harassment was racial or stemmed from racial animus." *See Bolden v. PRC, Inc. .*, 43 F.3d 545, 551 (10th Cir.1994) (*citing Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Thus, to constitute an actionable claim for hostile work environment, a plaintiff must be subjected to a "steady barrage of opprobrious racial comments;" a few isolated incidents of racial enmity or sporadic racial slurs is insufficient. *See id.* In this case, the comments and jokes plaintiff claims he heard

are insufficient as a matter of law to establish a claim for hostile work environment. Plaintiff has failed to set forth facts showing that racial comments were pervasive or severe.[4] Rather, plaintiff's evidence consists of isolated, non-threatening remarks made by known or unknown co-workers or clients. As such, plaintiff's claim is not actionable. *See id.* (granting summary judgment to defendant where plaintiff subjected to infrequent racial jokes and slurs).

Moreover, there is no evidence in the record that any member of management knew or should have known that a racially hostile environment existed. Indeed, plaintiff admits that he did not report any racial comments, even though plaintiff admittedly knew of the procedure available to him to report harassment, and plaintiff has brought forth no facts that management actually knew about racial comments being made. Plaintiff's allegations center around comments uttered by co-workers, which is not itself enough to establish liability against the defendant in this case. *See Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1241–42 (10th Cir.1999). For all these reasons, defendant is entitled to summary judgment on plaintiff's racially hostile work environment claim under both Title VII and § 1981.

### H. Retaliation

■ Plaintiff contends that he was retaliated against for filing the first EEOC charge. To establish a prima facie case of retaliation, plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) defendant subjected him to an adverse employment action subsequent to the protected activity; and (3) a causal connection exists between the protected activity and the adverse employment action. *See Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir.2000). Once plaintiff establishes a prima facie case, the burden of production shifts to

---

4. This is true even if the court considered the alleged racial comments made prior to the 300–day charge-filing period.

defendant to articulate a legitimate, non-discriminatory reason for the adverse action. If defendant presents evidence of a legitimate business reason, the plaintiff must then be allowed to demonstrate that the defendant's offered reasons are a mere pretext for discrimination. *See Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir.1996).

In this case, plaintiff engaged in a protected activity when he first complained to defendant of discrimination and then filed his first EEOC charge. Plaintiff complains that he was subjected to adverse employment actions after these events. As best the court can tell, plaintiff claims he: 1) was falsely accused of sexual harassment; 2) received declining evaluations; 3) failed to receive the third CIT position and Assistant Manager position; and 4) was subjected to extreme scrutiny by his supervisors. The court addresses each claim in turn.

### 1. Sexual Harassment Complaint

■ Approximately one month after plaintiff filed his first EEOC charge, plaintiff was accused of sexually harassing two female employees. It is undisputed in the record that the women involved did, in fact, complain to Mr. Boots on or about May 8, 1997. Regardless of when the two women complained, Mr. Boots was obligated under federal law to investigate the complaints. *See Wilson v. Tulsa Junior College*, 164 F.3d 534, 542–43 (10th Cir. 1998); *Heelan v. Johns–Manville Corp.*, 451 F.Supp. 1382, 1390 (D.Col.1978). Accordingly, Mr. Boots called in plaintiff and discussed the allegations. In response, plaintiff conceded that he may have touched the women. Once plaintiff received a warning in writing, Mr. Boots took no further action.

Plaintiff has failed to establish a prima facie case of retaliation with respect to the allegations of sexual harassment. Foremost, plaintiff has failed to show the court that he suffered adverse employment action arising out of the sexual harassment complaints. Plaintiff concedes that he suffered no disciplinary action as a result of the complaints. In this circumstance, Mr. Boot's counseling of plaintiff and subsequent warning letter is not, by itself, an adverse employment action. *See Hertenstein v. Kimberly Home Health Care, Inc.*, 58 F.Supp.2d 1250, 1260 (D.Kan.1999) (finding that employer's counseling of plaintiff regarding inappropriate length of plaintiff's skirts and shorts insufficient to establish adverse employment action).

Even if the court determined that the counseling of plaintiff was itself an adverse employment action, there is no evidence in the record of a causal connection between the filing of the EEOC charge and the counseling by Mr. Boots. In response to the sexual harassment allegations, Mr. Boots had a legal duty to investigate the matter. An investigation would reasonably include meeting with plaintiff and, after plaintiff conceded that he may have touched the women, then advising plaintiff that such actions are not tolerable in the workplace. Moreover, there is absolutely no evidence before this court that defendant controlled the timing of the women's allegations, and plaintiff concedes that he has no information or specific facts that the charges were trumped up against him.

### 2. Declining Evaluations

■ Plaintiff alleges that he received declining scores on his performance evaluations in retaliation for his complaining of discrimination. In support, plaintiff offers as evidence that he received an outstanding evaluation from Beech some twelve years ago. His evaluations thereafter were as follows: 94.6% for 1994; 91.9% for 1995; 87% for 1996; 72.5% for 1997; and (after a change in format) 36 out of 60 by Ms. Sissom, and 28 out of 60 by Ms. Drazil on his latest evaluation.

The court notes that plaintiff filed his first EEOC charge in April 1997. Plaintiff did, however, complain to defendant about the selection of Mr. Frisch in the fall of 1996, to which defendant responded by conducting and investigation. The court will, therefore, consider those evaluations

that occurred subsequent to plaintiff's complaint of discrimination: the 1996 evaluation, the 1997 evaluation, and the latest evaluation. With respect to those evaluations, the court finds that plaintiff has failed to offer any evidence that a causal connection exists between his complaints of discrimination and his declining evaluation scores.

Moreover, defendant has offered nondiscriminatory reasons for the scores. There is evidence in the record that the declining scores were as a result of plaintiff's languishing work performance. As early as March 1995, plaintiff had been counseled for being late to work. Thereafter, plaintiff was chronically late to work, for which he was continually counseled by his supervisors. In addition, on both his 1996 and 1997 evaluations, plaintiff defied his responsibility of submitting his performance goals and further had refused to cooperate in the formulation of his job description. Plaintiff also continually had problems submitting to the authority of his supervisors. As for plaintiff's latest evaluation, plaintiff specifically admits that "[t]here is a specific factual basis for his ratings in the evaluation." (Plaintiff's Response to Defendant's Uncontroverted Fact ¶ 153). In this circuit, a plaintiff cannot prevail by merely challenging in general terms the accuracy of a performance evaluation without any additional evidence. *See Fallis v. Kerr–McGee Corp.*, 944 F.2d 743, 747 (10th Cir.1991). Plaintiff in this case has failed to bring forth additional evidence that his declining scores were unwarranted. As such, the court concludes that there exists no evidence from which a finder of fact could infer retaliation in regard to plaintiff's evaluation scores.

**3. Third CIT Position and Assistant Manager Position**

 Plaintiff claims that he was not promoted to the third CIT position or Assistant Manager position in retaliation for his discrimination complaints. The court has already found that defendant's articulated reasons for selecting Ms. Drazil and Mr. Schaefer were not a pretext for discrimination. The question before the court now is whether plaintiff has established a prima facie case of retaliation and, if so, whether those same nondiscriminatory reasons for selecting Ms. Drazil and Mr. Schaefer were a pretext for retaliation.

The court finds that plaintiff has failed to establish a prima facie case of retaliation. Plaintiff has offered no evidence—direct or circumstantial—of a causal connection between his protected conduct and the selections of Ms. Drazil and Mr. Schaefer. Plaintiff simply relies on his subjective opinion that he was denied these position for retaliatory reasons and admits that he has no other information to support his contentions. Plaintiff' subjective belief, without more, is insufficient to infer a causal connection. *See Candelaria v. E.G. & G. Energy Measurements, Inc.*, 33 F.3d 1259, 1261 (10th Cir.1994). The court further notes the proximity in time between the protected conduct and the failure to receive the promotions. Plaintiff filed his first EEOC charge in April 1997. Nearly eight months passed before Mr. Schaefer's selection, and over one year passed before Ms. Drazil's selection. Considering the utter lack of evidence of retaliatory motive, the court finds that the proximity in time does not support an inference of retaliation sufficient to survive summary judgment. *See Garcia–Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547, 560–61 (D.Kan.1995) (holding that adverse action occurring eight to nine months after protected activity insufficient to support inference of causal connection).

Even if plaintiff could establish a prima facie case, the court finds that plaintiff has failed to meet his burden of showing that the proffered nondiscriminatory reasons (set forth in Sections III(D), and III(E)(2) of this opinion) are pretextual. Indeed, plaintiff has failed to bring forth any evidence that would establish a genuine issue of fact on this issue. Summary judgment is therefore appropriate.

#### 4. Scrutiny by Supervisors

█ Plaintiff contends that he was subject to intense scrutiny by his supervisors in retaliation for his discrimination complaints. Plaintiff is referring to his supervisor's monitoring of his arrival times and subsequent counseling regarding his tardiness.

With respect to plaintiff's burden of establishing a causal connection between his complaints of discrimination and the monitoring of his arrival times, plaintiff has presented evidence sufficient to create a genuine issue of fact. At the outset, the court notes that plaintiff had been counseled about his tardiness as early as March 1995, long before he ever complained of discrimination. However, in support of his allegation, plaintiff points to the March 1998 e-mail from Mr. Orlando to Ms. Sissom, wherein Mr. Orlando asks that plaintiff not be counseled about an incident of tardiness in order to avoid the appearance of retaliation. Mr. Orlando testified that he knew plaintiff had just filed suit claiming retaliation and that defendant had to be very careful about how it handled any discipline of plaintiff. Significant to the court is the fact that Mr. Orlando requested Ms. Sissom *not* to counsel plaintiff but merely log plaintiff's tardiness. A finder of fact could reasonably infer that such statements establish that defendant lacked any retaliatory intent. On the other hand, a finder of fact could also infer that the statement, "[W]e don't want to give the appearance of retaliation," is evidence of a retaliatory motive. Thus, viewing all reasonable inferences in the light most favorable to the nonmoving party, the court finds that there exists an issue of fact regarding a causal connection.

Detrimental to his claim, however, is that plaintiff has failed to present evidence that he has suffered any adverse employment action as a result of being closely monitored. Conduct must have some impact on the plaintiff's employment status to be considered adverse employment action. *See Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 533 (10th Cir.1998). Caus-

ing hurt or feelings of humiliation, without altering an employee's status, is not adverse employment action. *See Colter v. Dobski & Assoc., Inc.,* 35 F.Supp.2d 824, 830 (D.Kan.1999). In this case, the mere fact that a supervisor kept track of plaintiff's arrival times does not constitute adverse employment action. *See Sharon v. Yellow Freight Sys., Inc.,* 872 F.Supp. 839, 847 (D.Kan.1994), *aff'd,* 107 F.3d 21 (10th Cir.1997) ("The fact that a supervisor keeps a log, however, does not in itself work a material alteration of the terms and conditions of plaintiff's employment."). Plaintiff has failed to present evidence to support a genuine factual issue with respect to adverse employment actions and, therefore, he has failed to establish a prima facie case of retaliation.

Moreover, even if plaintiff had presented evidence to support a prima facie case, he has failed to create a genuine issue of fact with regard to pretext. Defendant asserts that it had a legitimate, nondiscriminatory reason for making sure plaintiff arrived to work on time because one of plaintiff's job duties was to insure that the computers were functioning properly *before* classes began at 8:00 a.m. To accomplish this, defendant contends that it was important for plaintiff to be to work by 7:30 a.m. to assure that the computers were ready and that there were no computer problems when classes began, especially in light of the fact that plaintiff was the only individual charged with that responsibility. Significantly, plaintiff concedes that this is a legitimate interest of defendant's and further presented no evidence that defendant was more likely motivated by retaliation.

In sum, plaintiff has failed to present evidence sufficient to withstand summary judgment on his claim of retaliation. Defendant's motion on plaintiff's claim of retaliation under Title VII and § 1981 is therefore granted.

Having ruled that plaintiff's claims in this lawsuit do not withstand summary judgment, the court finds that defendant's motion on this issue of punitive damages is

moot. Further, defendant's motion to limit the time period in which plaintiff may raise allegations of discrimination is also moot.

## IV. Summary of Court's Ruling

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Doc. 89) be granted in its entirety, and defendant's motion to limit the time period in which plaintiff may raise allegations of discrimination (Doc. 80) is moot.